1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  JANE BEJERANO GARCIA, | Case No.  1:19-cv-00545-SAB |
| 12        Plaintiff, | ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL |
| 13      v. | (ECF Nos. 13, 18, 19) |
| 14  COMMISSIONER OF SOCIAL SECURITY, | |
| 15        Defendant. | |
| 16 | |

17

## I.

18

## INTRODUCTION

19

20        Jane Bejerano Garcia ("Plaintiff") seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for

21

disability benefits pursuant to the Social Security Act.  The matter is currently before the Court

22

on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley

23

A. Boone.[1]

24

25        Plaintiff suffers from migraine headaches, exogenous obesity, fibromyalgia syndrome,

gastro-esophageal reflux disease, diabetes mellitus type II, acne varioliformis, hypertension,

26

anxiety disorder, major depressive disorder with anxious features, posttraumatic stress disorder,

27

28

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge.  (See ECF Nos. 7, 8.)

bipolar disorder, obsessive-compulsive disorder, and mild cognitive disorder.  For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff filed an application for a period of disability and disability insurance benefits on May 18, 2011.  (AR 77.)  A hearing was conducted and the ALJ found that Plaintiff was not disabled on June 24, 2014.  (ECF No. 78-90.)

Plaintiff protectively filed a second application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income on December 2, 2014.  (AR 128, 129.)  Plaintiff's applications were initially denied on June 3, 2015, and denied upon reconsideration on October 15, 2015.  (AR 166-169, 172-175, 189-194, 196-201.)  Plaintiff requested and received a hearing before Administrative Law Judge Timothy S. Snelling ("the ALJ").  Plaintiff appeared for a hearing on July 14, 2017.  (AR 35-76.)  On April 2, 2018, the ALJ found that Plaintiff was not disabled.  (AR 7-23.)  The Appeals Council denied Plaintiff's request for review on February 21, 2019.  (AR 1-3.)

### A.    Hearing Testimony

Plaintiff appeared with counsel and testified at the July 14, 2017 hearing.  (AR 44-47, 48-70.)  Plaintiff was born on May 1, 1976, and was 41 years old on the date of the hearing.  (AR 44.)  Plaintiff attended college and received an associate of science degree in medical assisting from San Joaquin Valley College.  (AR 44-45.)  Plaintiff worked from 2002 to 2007 as a medical assistant.  (AR 45-46.)  She changed jobs to obtain a higher salary.  (AR 46.)  When she was working, the doctor would ask her to do something and she could not remember things.  (AR 65.)  She would have to go back over and over to ask him what she was to be doing.  (AR 65.)  She would write things down and then forget what she wrote.  (AR 65.)  She would forget where she put things and when helping with a procedure she would not pay attention.  (AR 65-66.)  She would forget how to do the procedure.  (AR 66.)  When they started learning the computer, she left because she could not do the computer anymore.  (AR 66.)

Plaintiff lives with her husband, her 22 year old son, her 19 year old son, her son's 22

year old girlfriend, and her son's four children who are 9, 4, 3, and 3 months old.  (AR 62-63.)
Her oldest son works on and off but is laid off right now and her 19 year old son is not working
right now because they only call him to work when they need him.  (AR 63-64.)  Her son's
girlfriend works.  (AR 63.)  They will not let Plaintiff babysit her grandchildren.  (AR 64.)  Her
son and his girlfriend trade off watching them or Plaintiff's mother will come over or pick.  (AR
65.)  Her husband used to be a press operator but he just got laid off.  (AR 64.)

Plaintiff has migraine headaches and is overweight.  (AR 49.)  She is five feet tall and
weighs 180 pounds.  (AR 49.)  She was 200 pounds at her heaviest.  (AR 49.)  She has been
diagnosed with fibromyalgia syndrome, anxiety disorder, depression, posttraumatic stress
disorder, bipolar disorder, major depressive disorder that is recurrent and is described as
moderate with anxious features, and obsessive compulsive disorder.  (AR 49.)  Plaintiff has
diabetes, hypertension, varioliformis, gastrointestinal problems, esophageal reflux, and seizure
disorder.  (AR 50-51.)  Plaintiff does not have seizures much at this time and her seizure disorder
is somewhat under control.  (AR 51.)

She is taking seizure medication and last had a petit mal seizure a week and a half prior to
the hearing in July 2017.  (AR 51, 53.)  She had the seizure at home with her children and
grandchildren present.  (AR 52.)  She had an aura and then blacked out.  (AR 52.)  She fell and
her head hit the table.  (AR 52.)  She felt the aura and was getting dizzy.  (AR 53.)  She started to
fall and her son tried to catch her.  (AR 53.)  When she fell she hit the table and blacked out.
(AR 53.)  She does not think that she would have blacked out had she not hit the table.  (AR 53.)
Her children called the doctor and were told to call an ambulance.  (AR 53.)  The ambulance
came and took care of Plaintiff.  (AR 53.)  She was taken to the emergency room.  (AR 53.)
They told her that everything was fine and she was probably doing too much activity.  (AR 54.)
They thought it was probably a migraine and not a seizure.  (AR 54.)  But Plaintiff never shakes
when she has a migraine.  (AR 54.)  She had a bump on her head where she hit it.  (AR 54.)
Plaintiff does not know when she had a seizure before that, but her husband says she sometimes
has them in her sleep.  (AR 55.)  Plaintiff is comfortable with the medication that she is being
prescribed for her seizures, migraine, and blood pressure.  (AR 55-56.)

3

1    Since the prior hearing, Plaintiff's condition has changed because her body is in severe
2    pain.  (AR 56.)  It is painful for her to walk.  (AR 56.)  She cannot walk as long as she used to.
3    (AR 56.)  When she does something too much on one day, she cannot do it the next day because
4    she is fatigued.  (AR 57.)  She will practically have to stay in bed the next day.  (AR 57.)  She is
5    always out of breath.  (AR 57.)  Plaintiff is tired and depressed.  (AR 57.)  Every part of her body
6    hurts.  (AR 57.)  Nothing makes her feel better, not even medication.  (AR 57.)  They have told
7    her that it is fibromyalgia and there is nothing they can do for it.  (AR 57.)

8    Plaintiff saw a cardiologist for her shortness of breath.  (AR 57.)  He did a lot of testing.
9    (AR 57.)  He did a heart test and an ultra sound and said that she was good.  (AR 58.)  He said
10   that her shortness of breath was just fibromyalgia.  (AR 58.)  She continues to have shortness of
11   breath, even when she is just sitting.  (AR 58.)  She has shortness of breath every day.  (AR 58.)
12   Plaintiff does not smoke and has never smoked.  (AR 58-59.)

13   They did a sleep study but did not find anything.  (AR 59.)  She thinks there was
14   something small but they said she did not need anything right now.  (AR 59.)  She has trouble
15   sleeping and does not sleep at all.  (AR 59.)  When questioned about the statement because she
16   must get some sleep, Plaintiff testified that she sleeps a half hour here and there.  (AR 59.)  She
17   tries to sleep but does not sleep.  (AR 59.)  Plaintiff has sleeping medication that could put her to
18   sleep for a little while but then she wakes up.  (AR 59.)  She typically wakes up three to four
19   times a night.  (AR 59.)  When she wakes up she has to get up and walk around the house.  (AR
20   59-60.)  Then, she will go back and lay down.  (AR 60.)  She will put the television on for a bit
21   and then turn it off and try to sleep for another twenty to thirty minutes.  (AR 60.)  They thought
22   that the antidepressants she was taking were causing her not to sleep, but they changed her
23   medications and there has been no noticeable change in her sleep.  (AR 60.)

24   She had nerve testing to see if they could find the cause of her pain.  (AR 60.)  The doctor
25   said they could not find anything, but they were going to do another test on her hands.  (AR 60.)
26   She has not heard anything on that.  (AR 60.)  They found that Plaintiff had a foot drop.  (AR
27   61.)  She went to UCSF they found a blood clot and thought she might have neuropathy.  (AR
28   61.)  She is supposed to follow up on that but has too many things right now.  (AR 61.)

1    Plaintiff cries a lot and is very emotional.  (AR 61.)  She does not like for people to see
2    her like that.  (AR 61.)  She does not visit with friends anymore.  (AR 61.)  Plaintiff does not do
3    normal tasks around the house.  (AR 61.)  She tries to get her children to help her or the chores
4    just wait until she can try and get them done.  (AR 61.)

5    Plaintiff's migraine headaches have gotten worse.  (AR 66.)  Sometimes she stays in bed
6    two or three days with them.  (AR 66.)  She gets two headaches a week.  (AR 66.)  The ones that
7    keep her in bed occur once a week.  (AR 66.)  She will have to stay in a dark and quiet room.
8    (AR 66-67.)  It takes her at least two days to recover.  (AR 67.)  The medication that she takes
9    just takes the edge off, reduces the strength of the headaches.  (AR 67.)  They tried a lot of
10   different medications and the current medication is the most effective.  (AR 67.)  She can feel
11   when she is going to get a migraine.  (AR 67.)  She will take her medication when she feels a
12   migraine coming on.  (AR 67.)  Typically, it will take two days for the migraine to go away.
13   (AR 67.)  She isolates herself within her house in a dark, quiet place in the house.  (AR 67.)
14   There are a lot of people in her house so she just lets them know that she needs peace and quiet
15   and everyone will just tip toe around.  (AR 68.)

16   Due to her fatigue, Plaintiff naps for twenty to thirty minutes once a day.  (AR 69.)  Her
17   pain is eight out of ten when she gets up in the morning and will ease off to five as she gets going
18   and as long as she tries to keep herself going.  (AR 69.)  By six or seven in the evening, the pain
19   will be back to eight or nine out of ten.  (AR 69.)  Plaintiff will have done too much if she tries to
20   get all the laundry done, cleans the kitchen, and cleans the whole house in a full day.  (AR 69-
21   70.)  Then, she will spend the next day in bed.  (AR 70.)

22   Cheryl Chandler, a vocational expert ("VE"), also testified at the hearing.  (AR 47-48,
23   71-75.)

24   **B.    ALJ Findings**

25   The ALJ made the followings findings of fact and conclusions of law.  First, the ALJ
26   found that the denial of Plaintiff's prior application, dated June 24, 2014, was res judicata as to
27   the period prior to that date.  (AR 10.)  Plaintiff had presented new and material evidence that
28   warranted a change in her residual functional capacity.  (AR 10.)  Therefore, the current decision

addresses the period from June 24, 2014 through the date of decision.  (AR 10.)

- Plaintiff met the insured status requirements of the Social Security Act through September 30, 2014.

- Plaintiff has not engaged in substantial gainful activity since the alleged onset date of March 1, 2009.

- Plaintiff has the following medically severe combination of impairments: migraine headaches, exogenous obesity, fibromyalgia syndrome, gastro-esophageal reflux disease, diabetes mellitus type II, acne varioliformis, hypertension, anxiety disorder, major depressive disorder with anxious features, posttraumatic stress disorder, bipolar disorder, obsessive-compulsive disorder, and mild cognitive disorder.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity to perform a wide range of medium work as defined in 20 CFR §§ 404.1567(c) and 416.967(c).  Plaintiff can perform lifting and carrying 50 pounds occasionally and 25 pounds frequently; can stand for six hours, walk for six hours, and sit for six hours in an eight-hour workday with normal breaks.  She can frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but cannot climb ladders, ropes, and scaffolds.  She must avoid concentrated exposure to very loud noise, very bright lights, vibrations, pulmonary irritants such as dust, fumes, and gases, and workplace hazards such as dangerous moving machinery and unprotected heights. Plaintiff cannot understand, remember, and apply information necessary to perform complex and detailed work or make judgments on complex and detailed work-related job assignments or cope with the stress normally associated with semi-skilled or skilled employment.

- Plaintiff is unable to perform past relevant work as a medical assistant.

- Plaintiff was born on May 1, 1976, and was 32 years old which is defined as a younger individual age 18-49.

- Plaintiff has at least a high school education and is able to communicate in English.

6

1   • Transferability of job skills is not material to the determination of disability because

2      using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is

3      not disabled whether or not she has transferable job skills.

4   • Considering Plaintiff's age, education, work experience, and residual functional capacity,

5      there are jobs that exist in significant numbers in the national economy that Plaintiff can

6      perform.

7   • Plaintiff has not been under a disability as defined in the Social Security Act from March

8      1, 2009 through the date of this decision.

9   (AR 13-23.)

10                                         **III.**

11                                **LEGAL STANDARD**

12       To qualify for disability insurance benefits under the Social Security Act, the claimant

13   must show that she is unable "to engage in any substantial gainful activity by reason of any

14   medically determinable physical or mental impairment which can be expected to result in death

15   or which has lasted or can be expected to last for a continuous period of not less than 12

16   months." 42 U.S.C. § 423(d)(1)(A).  The Social Security Regulations set out a five step

17   sequential evaluation process to be used in determining if a claimant is disabled.  20 C.F.R. §

18   404.1520;[2] Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th

19   Cir. 2004).  The five steps in the sequential evaluation in assessing whether the claimant is

20   disabled are:

21       Step one: Is the claimant presently engaged in substantial gainful activity? If so,
         the claimant is not disabled. If not, proceed to step two.
22

23       Step two: Is the claimant's alleged impairment sufficiently severe to limit his or
         her ability to work? If so, proceed to step three. If not, the claimant is not
24       disabled.

25       Step three: Does the claimant's impairment, or combination of impairments, meet
         or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the
         claimant is disabled. If not, proceed to step four.
26

27   ---
     [2] The cases generally cited herein reference the regulations which apply to disability insurance benefits, 20 C.F.R.
     §404.1501 et seq., however Plaintiff is also seeking supplemental security income, 20 C.F.R. § 416.901 et seq.  The
     regulations are generally the same for both types of benefits.  Therefore, further references are to the disability
28   insurance benefits regulations, 20 C.F.R. §404.1501 et seq.

Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error."  Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012).  "Substantial evidence" means more than a scintilla, but less than a preponderance.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted).  "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion."  Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).  However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

## IV.

## DISCUSSION AND ANALYSIS

Plaintiff argues that the ALJ erred by rejecting the opinion of every medical professional concerning Plaintiff's mental impairments and relied on his own lay interpretation of the record.

1  Plaintiff also contends that the ALJ erred by rejection Plaintiff and her lay witness testimony
2  without setting forth clear and convincing reasons.

3      Defendants counters that the ALJ properly considered Plaintiff's subjective complaints
4  and found them not entirely consistent with the record and gave germane reasons to reject the
5  testimony of Plaintiff's daughter.  Defendant argues that the ALJ articulated legally sufficient
6  reasons for the weight afforded to the medical evidence.

7      Plaintiff replies that the ALJ erred by rejecting the moderate limitations opined by Drs.
8  Barnett and Portnoff.  Plaintiff contends that the ALJ erred by discounting the opinion of her
9  daughter without proper evaluation.

10     **A.     Medical Opinion**

11     Plaintiff challenges the ALJ's decision only to the mental health opinions in the record.
12  Plaintiff contends that the ALJ rejected the opinion of Dr. Portnoff that Plaintiff had moderate
13  limitations in her ability to relate to others and to complete a normal workweek without
14  interruptions from her psychiatric conditions and his opinion without explanation.  Similarly,
15  Plaintiff argues that the ALJ erroneously rejected Dr. Dhillon's opinion that Plaintiff had marked
16  limitation as inconsistent with the medical record.

17     Defendant counters that the ALJ properly addressed the social limitations by finding that
18  Dr. Portnoff overstated her limitations based upon the fact that Plaintiff lived with multiple
19  family members and both Plaintiff and her daughter stated that Plaintiff had no difficulty getting
20  along with coworkers or authority figures.  Further, Defendant contends that the ALJ did not
21  reject the moderate limitations in her ability to complete a normal workweek without
22  interruptions from her psychiatric symptoms because he found moderate limitation in adaption
23  but that she could carry out tasks in a simple work environment and reflected that determination
24  in the residual functional capacity assessment.  Defendant contends that the ALJ properly
25  rejected the opinion of Dr. Dhillon because it was based on the diagnosis of chronic migraine
26  headaches and was inconsistent with the treatment notes of Dr. Raskin.  Finally, Defendant
27  argues that the ALJ properly found that the treatment records subsequent to Dr. Barnett's opinion
28  show that Plaintiff was stable with limited treatment.

1    The weight to be given to medical opinions depends upon whether the opinion is
2    proffered by a treating, examining, or non-examining professional.  See Lester v. Chater, 81 F.3d
3    821, 830-831 (9th Cir. 1995).  "Generally, the opinions of examining physicians are afforded
4    more weight than those of non-examining physicians, and the opinions of examining non-
5    treating physicians are afforded less weight than those of treating physicians.  Orn v. Astrue, 495
6    F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(1)-(2)).  "If a treating or
7    examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject
8    it by providing specific and legitimate reasons that are supported by substantial evidence."
9    Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing 20 C.F.R. § 404.1527(d)(3)).  The
10   contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific,
11   legitimate reason for rejecting a treating or examining physician's opinion, however, "it may
12   constitute substantial evidence when it is consistent with other independent evidence in the
13   record."  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  The ALJ need not accept
14   the opinion of any physician that is brief, conclusory, and unsupported by clinical findings.
15   Thomas, 278 F.3d at 957.

16       At step two, the ALJ found that Plaintiff had a severe mental impairment but that the
17   impairments did not meet or medically equal the severity of the listed impairments.  (AR 13.)
18   Plaintiff contends that the ALJ failed to address Dr. Portnoff's finding that Plaintiff was
19   moderately limited in her ability to relate to others and to complete a normal workweek without
20   interruptions from her psychiatric conditions.  However, the ALJ addressed these limitations at
21   step two.

22       In interacting with others, the claimant had a mild limitation.  This finding was
         consistent with the opinions of State agency medical consultant psychiatrist A.
23       Garcia, M.D. and State agency medical consultant psychologist Preston Davis
         Psy.D (Exhibits B4A p. 11, B8A p. 11) [AR 122, 157].  The claimant had mild
24       limitations in her ability to accept instructions from supervisors (Exhibit B8F p. 6)
         [AR 646].  The claimant lived with two of her children aged 19 and 17 (Exhibit
25       B8F p. 4) [AR 644].  There was no evidence of the claimant having difficulty
         getting along with others.  Overall there was no evidence of more than mild
26       limitation in this area.
         . . .
27
         As for adapting or managing oneself the claimant experienced a moderate
28       limitation.  This finding was consistent with the opinion of consultative

10

psychologist Lance Portnoff Ph.D. who opined that the claimant had moderate limitations in her ability to maintain regular attendance in the workplace from a psychological standpoint moderate limitation in her ability to complete a normal workday or workweek without interruptions from a psychiatric condition and moderate limitation in her ability to deal with the stress encountered in a competitive work environment (Exhibit B8F p. 6) [AR 646]. Overall there was no evidence of more than moderate limitation in this area.

(AR 14.)

The ALJ considered that the treatment record showed that

the claimant received treatment for generalized anxiety disorder (Exhibit B17F p. 1) [AR 943], major depressive disorder with anxious features (Exhibits B8F p. 5, B14F p. 3, B17F p. 1) [AR 645, 859, 943], posttraumatic stress disorder (Exhibit B4F, pp. 7-8) [AR 570-571], bipolar disorder (Exhibit B4F, pp. 7-8) [AR 570-571], obsessive compulsive disorder (Exhibit B8F p. 5) [AR 645], and mild cognitive disorder (Exhibit B8F p. 5) [AR 645]. In March 2011, the claimant's primary care physician started the claimant on medication for depressive disorder and sleep (Exhibit B9F p. 125) [AR 772].

(AR 18.)

The ALJ considered that on November 26, 2013, Dr. Dhillon had opined that Plaintiff had chronic migraine headaches with photophobia. (AR 21, 561.) He opined that her symptoms would be constantly severe enough to interfere with the attention and concentration required to perform simple work-related tasks. (AR 21, 561.) Her medications caused nausea and drowsiness. (AR 21, 561.) He also opined physical limitations. (AR 21, 561-563.)

The ALJ considered that on December 9, 2013 and January 2, 2014, psychiatrist Michael Barnett, M.D. treated the claimant for bipolar disorder and PTSD. (AR 18, 571, 573). On December 9, 2013, Plaintiff reported that she was spending her days transporting her children, babysitting and caring for her grandchildren, and caring for her father who had prostate cancer. (AR 570.) Plaintiff reported rapid mood swings and a hypomanic episode every fifteen days that lasted two or three days. (AR 570.) Every fifteen days she would have a depressive episode that would last two to three days. (AR 570.) Plaintiff was found to have a depressed mood and blunted affect. (AR 571.) Dr. Barnett found that Plaintiff was bipolar and her antidepressants were making her cycle rapidly. (AR 571.) Her medication was changed. (AR 571.)

Plaintiff returned on January 2, 2014, and reported being compliant with her medication with no side effects. (AR 572.) She also reported that she was not sleeping well, was restless

1    and had racing thoughts.  (AR 572.)  She felt more awake and active during the day.  (AR 572.)

2    Plaintiff was tearful and reported that her headaches were worse.  (AR 572.)  Dr. Barnett found

3    that Plaintiff was difficult to understand and was intermittently tearful and in obvious distress.

4    (AR 572.  He opined that it was possible that Plaintiff was experiencing withdrawal symptoms

5    from the serotonin reuptake inhibitors.  (AR 572.)  On this date, he completed a depression and

6    anxiety questionnaire in which he opined that Plaintiff had no restrictions in her activities of

7    daily living; but had marked difficulties in maintaining social functioning; deficiencies in

8    concentration, persistence, or pace; and marked episodes of deterioration or decompensation in

9    work or work-like settings.  (AR 20, 575.)

10    The ALJ considered that on April 30, 2014, treating psychiatrist Elizabeth Tully, M.D.

11    saw Plaintiff for a new patient mental health examination and indicated she could safely receive

12    outpatient treatment as the least restrictive alternative.  (AR 18-19, 685.)  Plaintiff appeared

13    depressed and anxious in the office, but stated that she just needed to calm down.  (AR 684.)

14    Plaintiff's attitude was cooperative and psychomotor activity was within normal range.  (AR

15    685.)  Plaintiff had no abnormal body movements.  Her attention was good and the degree of

16    awareness of her surroundings was within normal limits.  (AR 685.)  Orientation was in context

17    of the interview.  (AR 685.)  Plaintiff's affect was constricted and her mood was depressed.  (AR

18    685.)  Speech was normal.  (AR 685.)  Plaintiff had minimal insight but her thought process was

19    intact and thought content was relevant to the interview.  (AR 685.)  There was no perceptual

20    disorder noted.   (AR 685.)  Plaintiff initially declined medication, but after further discussion

21    agreed to try Effexor.  (AR 19, 685.)

22    On June 11, 2014, Plaintiff reported that she was taking the Effexor and it was helping.

23    (AR 19, 680.)  She was also taking Xanax that had been prescribed by Dr. Dhillon.  (AR 19,

24    680.)  Plaintiff reported that she had been experiencing a migraine for two days.  (AR 680.)  She

25    was very photophobic and looked ill.  (AR 680.)  On examination, Dr. Tully noted Plaintiff's

26    attitude was cooperative and she had no abnormal body movements.  (AR 680.)  She was

27    distractible. (AR 680.)  Her degree of awareness of surroundings was within normal limits.  (AR

28    680.)  Plaintiff's orientation was in context with the interview.  (AR 680.)  Her affect was

1  constricted and mood was sad.  (AR 680.)  Plaintiff had normal speech, good insight, and fair

2  judgment.  (AR 680.)  Her thought processes were intact and her thought content was relevant to

3  the interview.  (AR 680.)  There were no perceptual disorders noted. (AR 680.)  Plaintiff was

4  estimated to have average intelligence.  (AR 681.)  Her impulse control was good.  (AR 681.)

5  Plaintiff's depression was noted to be stable.  (AR 681.)

6        On April 16, 2015, at the request of the agency, consultative psychologist Lance Portnoff,

7  Ph.D. completed a psychological evaluation of Plaintiff.  (AR 19, 642-647.)  Plaintiff was driven

8  to the evaluation by her husband.  (AR 19, 642.)  The claimant complained of fibromyalgia,

9  migraines, anxiety, and depression.  (AR 19, 643.)   She reported chronic depression with apathy,

10  anhedonia, asociality, and passive suicidal ideas.  (AR 19, 643.)  She was worried and anxious

11  and had uncued panic attacks 4-5 times a week.  (AR 19, 643.)  Plaintiff reported incomplete

12  auditory and visual hallucinations, and obsessive-compulsive disorder with checking and

13  dermatillomania.  (AR 19, 643.)  Plaintiff denied any mania, PTSD, psychiatric hospitalizations

14  or counseling.  (AR 19, 643.)  Plaintiff had completed high school and did not receive special

15  education services.  (AR 19, 644.)  She was arrested in 2003 for driving under the influence.

16  (AR 19, 644.)  She last worked four years ago as a medical assistant for eight months.  (AR 19,

17  644.)  She lived with two of her children aged 19 and 17.  (AR 19, 644.)  Plaintiff reported that

18  she needed help to care for her personal needs and she had inadequate motivation for them.  (AR

19  19, 644.)  She could not travel alone.  (AR 19, 644.)  She could manage money and prepare food

20  for herself.  (AR 19, 644.)  On a typical day, she stayed at home and watched television; went for

21  a walk; and napped throughout much of the day.  (AR 19, 644.)

22        Upon examination, Plaintiff demonstrated adequate concentration, persistence, and pace.

23  (AR 19, 644.)  She was adequately-groomed.  (AR 19, 644.)  There was moderate psychomotor

24  slowing.  (AR 19, 644.)  Her eye contact was fair and her facial kinetics were moderately

25  reduced.  (AR 19, 644.)  Her speech was quiet, flat, and lacked spontaneity.  (AR 644.)

26  Receptive language was intact.  (AR 19, 644.)  Her thought process was coherent but mildly

27  impoverished.  (AR 19, 644.)  Her thought content was normal.  (AR 19, 644.)  She denied

28  hallucinations or suicidal ideation.  (AR 19, 644.)  She described her mood as depressed and her

affect was characterized by moderate anxious depression.  (AR 19, 644.)  Plaintiff was oriented to time and place and was in touch with her immediate surroundings.  (AR 19, 645.)  She could recall three items immediately and after several minutes.  (AR 19, 645.)  She could not perform simple calculations.  (AR 19, 645.)  She could count backwards from 20.  (AR 19, 645.)  Her abstract thinking was impaired.  (AR 19, 645.)  Her social judgment was inadequate.  (AR 19, 645.)  Her insight was adequate.  (AR 19, 645.)  Dr. Portnoff diagnosed Plaintiff with major depressive disorder with anxious features, obsessive-compulsive disorder, and mild cognitive disorder.  (AR 19, 645.)  He assigned Plaintiff a global assessment of functioning ("GAF") score of 53 indicating moderate symptoms.[3]  (AR 19, 645.)

Dr. Portnoff opined that Plaintiff is not capable of managing her own funds independently.  (AR 646.)  She is able to perform simple and repetitive tasks, and has mild limitations in her ability to perform detailed and complex tasks.  (AR 646.)  She has mild limitations in her ability to accept instructions from supervisors and moderate limitations in her ability to interact with coworkers and the public due to major depressive disorder and obsessive compulsive disorder.  (AR 646.)  Plaintiff has mild limitations in her ability to work on a consistent basis without special or additional instruction due to psychiatric problems.  (AR 646.)  Plaintiff has moderate limitations in her ability to maintain regular attendance in the workplace from a psychological standpoint and moderate limitations in her ability to complete a normal workday or workweek without interruptions from a psychiatric condition due to mood/cognitive symptoms.  (AR 646.)  Plaintiff's ability to deal with the stress encountered in a competitive work environment is moderately impaired due to major depressive disorder and obsessive compulsive disorder.  (AR 647.)

Plaintiff next received mental health treatment from Dr. Jaques on July 19, 2016.  (AR

---

[3] A GAF score is the clinician's judgment of the individual's overall level of functioning.  It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations.  Cornelison v. Astrue, 2011 WL 6001698, at *4 n.6 (C.D. Cal. Nov. 30, 2011) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 32 (4th ed. 2000)).  "A GAF score in the range of 51–60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning ( e.g., few friends, conflicts with peers or coworkers)."  Cornelison,  2011 WL 6001698, at 4 n.6 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 34).

882.)  Plaintiff reported ongoing severe depression, anxiety and insomnia.  (AR 882.)  She was found to make good eye contact.  (AR 882.)  Plaintiff was appropriately dressed, speech was normal in rate and rhythm, and she had normal psychomotor activity.  (AR 882.)  Plaintiff's mood was "anxious."  (AR 882.)   Her affect was broad with normal range and intensity.  (AR 882.)  Sensorium was alert and oriented times 3.  (AR 882.)  Her thoughts were congruent, logical, and goal directed.  (AR 882.)  There were no hallucinations, delusion, paranoia, or suicidal or homicidal ideation.  (AR 882.)  Plaintiff's insight and judgment were fair.  (AR 882.)

Plaintiff had similar findings on August 19, 2016, and September 26, 2016.  (AR 878, 880.)  Treatment notes for December 14, 2016, note that Plaintiff missed or rescheduled several appointments.  (AR 876.)  Findings are similar to the previous appointments.  (AR 876.)

The ALJ considered that from January 11, 2017 to March 23, 2017, Plaintiff received treatment for generalized anxiety disorder and major depressive disorder.  (AR 19, 874, 943.)  On March 23, 2017, a mental status examination showed good eye contact and adequate grooming.  (AR 19, 943.)  Plaintiff had normal speech and psychomotor activity.  (AR 19, 943.)  Her mood was anxious and her affect was broad with normal range and intensity.  (AR 19, 943.)  Plaintiff was alert and oriented, her thoughts were congruent, logical, and goal directed.  (AR 19, 943.)  She had no hallucinations, delusions, paranoia, or suicidal or homicidal ideations.  (AR 19, 943.)

During the time period that Dr. Jaques treated Plaintiff, the record notes he recommended adding "SSRI" to treat Plaintiff's depression and anxiety, but she refused stating that alprazolam was the only mediation that worked for her.  (AR 874, 876, 878, 880, 943, 945.)  Plaintiff was advised of the risks associated with long term use of benzodiazepines, including risk for concomitant use with narcotics, and that Dr. Jaques will not be able to prescribe alprazolam and will be titrating down on clonazepam and she expressed understanding.  (AR 874, 876, 878, 880, 943, 945.)  At her February 23, 2017 and March 23, 2017 appointments, Plaintiff reported that her mood was beginning to lift and she was having no side effects from the medication.  (AR 943, 945.)

/ / /

1.     Dr. Barnett

The ALJ gave little weight to the opinion of Dr. Barnett that Plaintiff had marked limitations social functioning; concentration, persistence, or pace; and episodes of decompensation in work or work-like settings because it was inconsistent with the medical record, Plaintiff only received intermittent and minimal mental health treatment, and she was stable with limited treatment.[4]   (AR 20.)

Plaintiff argues that the ALJ erred in finding that she had intermittent and minimal mental health treatment because she was consistently treated for her mental health conditions and received constant medication adjustments in an attempt to control her symptoms.   However, substantial evidence supports the ALJ's finding that Plaintiff received intermittent and minimal mental health treatment.

Plaintiff was treated by Dr. Barnett from December 3, 2013 through December 2, 2014. (AR 561-563, 571-573.)   On January 2, 2014, Dr. Barnett found that Plaintiff was difficult to understand and was intermittently tearful and in obvious distress.   (AR 572.)   However, he opined that it was possible that Plaintiff was experiencing withdrawal symptoms.   (AR 572.)

Plaintiff saw Dr. Tully three months later in April 2014 and although she appeared depressed, her affect was constricted, and she had minimal insight, her examination results are otherwise unremarkable.   (AR 685.)   She exhibited good attention, speech was normal, her thought processes were intact and there was no perceptional disorder noted.   (AR 685.)   Plaintiff initially declined medication, but then agreed to take Effexor.   (AR 685.)

She returned two months later on June 11, 2014, and reported that the Effexor was helping and she was also receiving Xanax from Dr. Dhillon.   (AR 680.)   Plaintiff reported that she had been having a migraine for two days and she was distractible.   (AR 680.)   Her mood was sad and her affect was constricted.   (AR 680.)   Otherwise, Plaintiff had normal speech, good insight, and fair judgment.   (AR 680.)   Her thought processes were intact and her thought content

---

[4] In the concluding paragraph of her opening brief, Plaintiff argues that the ALJ rejected the opinion of Dr. Barnett. (ECF No. 13 at 14.)   However, the argument presented above discusses only the opinions of Drs. Portnoff and Dhillon.   The Court assumes that this is an error in Plaintiff's brief.   However, since Defendant addressed the opinion of Dr. Barnett in their opposition brief and Plaintiff addressed it the reply, the Court shall address the opinions of all three doctors.

1   was relevant to the interview.  (AR 680.)  There were no perceptual disorders noted. (AR 680.)

2   Plaintiff was estimated to have average intelligence.  (AR 681.)  Her impulse control was good

3   and her depression was noted to be stable.  (AR 681.)

4          Plaintiff next received mental health treatment from Dr. Jaques more than two years later

5   in July 2016.  (AR 882.)  She had an anxious mood, but her affect was broad with normal range

6   and intensity.  (AR 882.)  She had normal speech and psychomotor activity.  (AR 882.)  Her

7   thoughts were congruent, logical and goal directed.  (AR 882.)  Her insight and judgment were

8   fair.  (AR 882.)

9          Plaintiff saw Dr. Jaques in August 2016.  (AR 880.)  She again was found to be anxious

10  but made good eye contact and had normal speech and motor activity.  (AR 880.)  Her affect was

11  broad with normal range and intensity.  (AR 880.)  Her thoughts were congruent, logical and

12  goal directed.  (AR 880.)  She had fair insight and judgment.  (AR 880.)  Dr. Jaques suggested

13  the addition of "SSRI" to treat her depression and anxiety but Plaintiff refused.  (AR 880.)

14         Plaintiff returned in September 2016 and the notes from the appointment reflect the same

15  findings.  (AR 878.)  Again, the record notes that Plaintiff refused additional treatment for her

16  depression and anxiety.  (AR 878.)

17         Plaintiff missed or rescheduled several appointments and was not seen again until

18  December 2016.  (AR 876.)  Examination findings remained the same and Plaintiff refused

19  additional treatment.  (AR 876.)  Plaintiff was seen in January 2017; and two months later in

20  March 2017, with similar findings at both visits and the record again notes at each appointment

21  that she refused further treatment.  (AR 874, 943.)

22         Although Plaintiff received medication for her depression and anxiety, the record

23  supports that ALJ's conclusion that she received minimal mental health treatment and that her

24  depression symptoms were stable with treatment.  During the period at issue, Plaintiff went for

25  months and at one point several years without receiving mental health treatment.  There are

26  notations that Plaintiff appeared drowsy and with slurred speech at appointments with Dr.

27  Dhillon, her treating physician; however, there are no abnormal mental findings at these

28  appointments or during her visits with Dr. Raskin her treating neurologist and the record

indicates that her headaches were controlled.  (AR 589-590, 656, 661, 663, 664, 666, 673, 674, 675, 678, 686, 688, 690, 832, 844, 846.)  The ALJ provided specific and legitimate reasons to give little weight to the opinion of Dr. Barnett.  See Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (finding the ALJ properly failed to credit doctor opinion where the functional limitations were undermined by a conservative course of treatment and improvement in the claimant's condition.).

2.    Dr. Dhillon

The ALJ gave little weight to Dr. Dhillon's November 26, 2013 opinion that Plaintiff's chronic migraine symptoms would constantly be severe enough to interfere with the concentration and attention required to perform simple work-related tasks, because on February 14, 2014, Dr. Raskin, Plaintiff's treating neurologist, found that her migraine headaches were well controlled with medication and she had improved enough to go on a long journey with her husband.[5]  (AR 21.)

Plaintiff saw Dr. Raskin on February 27, 2014, and reported that she had improved when her medication was elevated.  (AR 589.)  Dr. Raskin noted that Plaintiff was doing better.  (AR 590.)  "All in all, she is better, but her function is somewhat limited.  (AR 590.)  His diagnosis was common migraine, not intractable.  (AR 590.)  Dr. Raskin offered to see Plaintiff again when she and her husband were going to make "the big journey."  (AR 590.)

Dr. Raskin's treatment notes support the ALJ's finding that her headaches were controlled with medication and he could reasonably infer that Plaintiff's ability to take a long journey was inconsistent with Dr. Dhillon's opinion regarding the severity of her symptoms due to her migraine headaches.   "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."  Burch, 400 F.3d at 679. The ALJ provided a specific and legitimate reason to reject the November 26, 2013 opinion of Dr. Dhillon.

---

[5] Plaintiff argues in her opening brief that the ALJ finding that Plaintiff received and was stable with minimal treatment is unsupported by the record.  (ECF No. 13 at 12.)  This appears to reference the reasons provided to reject Dr. Barnett's opinion.

3.      Dr. Portnoff

Plaintiff argues that the ALJ rejected the moderate limitations opined by Dr. Portnoff. However, the ALJ discussed Dr. Portnoff's opinion at step two.  He found that Plaintiff had moderate limitations in adapting and managing oneself.  (AR 14.)  In support of this finding, the ALJ noted that Dr. Portnoff opined that Plaintiff had moderate limitations in her ability to maintain regular attendance in the workplace, moderate limitations in her ability to complete a normal workday without interruptions from a psychiatric condition, and moderate limitation in her ability to deal with stress in a competitive work environment.  (AR 14.)  The ALJ did not reject Dr. Portnoff's moderate limitations in adapting or managing herself.  Plaintiff argues that the ALJ rejected Dr. Portnoff's opinion that Plaintiff was moderately limited in her ability to relate to others without comment.  However, the ALJ noted Dr. Portnoff's records showed that Plaintiff lived with her two children and that he found she had mild limitations in her ability to accept instructions from supervisors.  (AR 14, 644, 646.)  The ALJ found no evidence that Plaintiff had difficulty getting along with others.  (AR 14.)  Plaintiff was found to have no more than mild limitations in interacting with others.  (AR 14.)

The ALJ gave some weight to Dr. Portnoff's opinion because the available evidence showed that Plaintiff had moderate limitations in understanding and remembering and carrying out detailed and complex tasks but she could perform simple and repetitive tasks on a consistent basis.  (AR 20.)  The ALJ also found that the medical record showed that Plaintiff had moderate limitations in adaption but could consistently carry out tasks in a simple work environment.  (AR 20.)  However, the ALJ found that the claimant had no more than mild limitations in relating with others.  (AR 20.)

Plaintiff points to no evidence in the record that would support more than mild limitations in relating to others but merely argues that the ALJ failed to provide reasons to reject the opinion.  The evidence in the record supports that ALJ's conclusion that Plaintiff had no more than mild limitations in relating to others.  Specifically, as the ALJ pointed out, Plaintiff was living at home with her two children.  (AR 20, 62-63.)  Also living in the home were her husband, her son's girlfriend, and their four children.  (AR 62-63.)  Plaintiff's daughter reported

1 that Plaintiff has no difficulty in getting along with others.  (AR 318.)  Plaintiff herself reported

2 that she has never had a problem getting along with authority figures and has never been fired or

3 laid off because of problems getting along with other people.  (AR 345.)  The ALJ did not err in

4 rejecting Dr. Portnoff's opinion that Plaintiff was moderately limited in her ability to interact

5 with others.

6          Plaintiff argues that the ALJ rejected the other moderate limitations opined by Dr.

7 Portnoff without comment.  However, the ALJ did not reject the moderate limitations but

8 incorporated them into the RFC by including in the residual functional capacity assessment that

9 Plaintiff cannot understand, remember, and apply information necessary to perform complex and

10 detailed work or make judgments on complex and detailed work-related job assignments or cope

11 with the stress normally associated with semi-skilled or skilled employment.  (AR 15.)

12          The ALJ provided specific and legitimate reasons to reject Dr. Portnoff's opinion that

13 Plaintiff had moderate limitations in social functioning and incorporated the other moderate

14 limitations opined by Dr. Portnoff in the residual functional capacity assessment.

15          **B.      Residual Functional Capacity**

16          Although Plaintiff only states that she is challenging the weight provided to the medical

17 opinions, she raises multiple other challenges in her opening brief.  Plaintiff contends that the

18 residual functional capacity is legally deficient because no treating or examining physician

19 opined the specific limitations found by the ALJ and therefore the ALJ erred by substituting his

20 opinion for that of the doctors and failed to develop the record.

21          A claimant's residual functional capacity is "the most [the claimant] can still do despite

22 [his] limitations."  20 C.F.R. § 416.945(a)(1).  The RFC is "based on all the relevant evidence in

23 [the] case record."  20 C.F.R. § 416.945(a)(1).  "The ALJ must consider a claimant's physical

24 and mental abilities, § 416.920(b) and (c), as well as the total limiting effects caused by

25 medically determinable impairments and the claimant's subjective experiences of pain, §

26 416.920(e)."  Garrison, 759 F.3d at 1011.  At step four the RFC is used to determine if a claimant

27 can do past relevant work and at step five to determine if a claimant can adjust to other work.  Id.

28 "In order for the testimony of a VE to be considered reliable, the hypothetical posed must

1   include 'all of the claimant's functional limitations, both physical and mental' supported by the

2   record." Thomas, 278 F.3d at 956.

3        Although Plaintiff argues that there is no support for the residual functional capacity

4   assessment findings, the Court has found that the ALJ did not reject the moderate limitations

5   opined by Dr. Portnoff.  The ALJ accepted the opinion of Dr. Portnoff other than his finding that

6   Plaintiff was moderately limited in her ability to interact with coworkers and the public.  (AR

7   646.)  The residual functional capacity assessment findings need not be identical to the relevant

8   limitations but must be consistent with them.   Turner v. Comm'r of Soc. Sec., 613 F.3d 1217,

9   1223 (9th Cir. 2010).  "[A]n ALJ's assessment of a claimant adequately captures restrictions

10  related to concentration, persistence, or pace where the assessment is consistent with restrictions

11  identified in the medical testimony."  Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir.

12  2008).  Here, the ALJ found that Plaintiff's moderate limitations in adaption did not prohibit her

13  from consistently carrying out tasks in a simple work environment.  (AR 20.)

14       Further, as discussed above the ALJ provided legitimate and specific reasons to reject the

15  moderate limitations in social functioning.

16       The ALJ also considered the opinion of agency psychologist Preston Davis who opined

17  that Plaintiff's mental health limitations were non-severe.  (AR 21.)  Dr. Davis considered

18  Plaintiff's mental residual functional capacity on reconsideration.  (AR 103-106.)  After

19  reviewing the medical recording, including Dr. Portnoff's consultative examination, he affirmed

20  the previous finding that Plaintiff had mild restrictions in activities of daily living, mild

21  difficulties in social functioning, and mild difficulties in maintaining concentration, persistence

22  or pace.  (AR 106.)  Dr. Davis found that Dr. Portnoff's opinion stated that Plaintiff reported

23  vague auditory and visual hallucinations but then stated that she denied hallucinations.  (AR

24  106.)  Dr. Davis found that contradiction lowered the weight of Dr. Portnoff's opinion.  (AR

25  106.)  He also found that Dr. Portnoff's moderate limitations were not supported in the record.

26  (AR 106.)  Therefore, he adopted the prior finding that Plaintiff's mental impairments were non-

27  severe.  (AR 106.)

28       The ALJ gave little weight to this opinion because the evidence available at the hearing

1   showed that Plaintiff was more limited than previously determined.  (AR 21.)  In sum, the ALJ

2   accepted most of the moderate findings of Dr. Portnoff, but the mild limitations in social

3   functioning found by Dr. Davis.  (AR 14.)  The ALJ did not substitute his judgment for that of

4   the medical providers and substantial evidence in the record supports the ALJ's residual

5   functional capacity findings.

6        Plaintiff argues that the ALJ was required to further develop the record to have a

7   physician review his mental health treatment records after Dr. Davis issued his opinion.  The

8   ALJ has a duty to further develop the record where the evidence is ambiguous or the ALJ finds

9   that the record is inadequate to allow for proper evaluation of the evidence.  Mayes v. Massanari,

10  276 F.3d 453, 459-60 (9th Cir. 2001); Tonapetyan, 242 F.3d at 1150.  A specific finding of

11  ambiguity or inadequacy in the record is not required to trigger the necessity to further develop

12  the record where the record itself establishes the ambiguity or inadequacy.  McLeod v. Astrue,

13  640 F.3d 881, 885 (9th Cir. 2011).

14       Plaintiff relies on Molina v. Berryhill, No. 2:17-CV-01991 CKD, 2018 WL 6421287, at

15  *4 (E.D. Cal. Dec. 6, 2018), in which the Court found that the ALJ erred by failing to have a

16  consultative examination where the plaintiff fell, reinjuring her knee, and had additional testing

17  after the agency physicians had reviewed the record.  However, this case is distinguishable from

18  Molina.  While in Molina the claimant had suffered a new injury and new medical testing had

19  been done, here, the ALJ noted Plaintiff had sporadic and limited mental health treatment and

20  did not seek any mental health treatment other than medication from Dr. Dhillon during the two

21  years after he saw Dr. Portnoff.  Further, as the ALJ noted, the treatment notes from Dr. Jaques

22  show generally normal examination findings that are not inconsistent with Dr. Portnoff's

23  opinion.  The ALJ did not err by failing to further develop the record in this instance.

24       **C.    Plaintiff's Testimony**

25       "An ALJ is not required to believe every allegation of disabling pain or other non-

26  exertional impairment."  Orn, 495 F.3d at 635 (internal punctuation and citations omitted).

27  Determining whether a claimant's testimony regarding subjective pain or symptoms is credible,

28  requires the ALJ to engage in a two-step analysis.  Molina v. Astrue, 674 F.3d 1104, 1112 (9th

Cir. 2012).   The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."   Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted).   This does not require the claimant to show that her impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms.   Smolen, 80 F.3d at 1282.

Then "the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so."   Brown-Hunter v. Colvin, 806 F.3d 487, 488–89 (9th Cir. 2015).   "The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony."   Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted).   Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors. Lingenfelter, 504 F.3d at 1040; Thomas, 278 F.3d at 958.   In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment. . .." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284). The district court is constrained to review those reasons that the ALJ provided in finding the claimant's testimony not credible.   Brown-Hunter, 806 F.3d at 492.

The ALJ considered Plaintiff's testimony.

On December 2, 2014, the claimant filed applications for disability benefits pursuant to Title II and Title XVI of the Social Security Act and alleged inability to engage in competitive work activity due to fibromyalgia, migraine headaches,

anxiety, chronic depression, diabetes mellitus type II, hypertension, acne varioliformis, GERD, esophageal reflux, reflux esophagitis, vitamin B12 and vitamin D deficiencies.  On August 26, 2015, the claimant alleged she had seizures every day Exhibit B12E.

The claimant testified at a hearing held on July 14, 2017.  She testified that she had been a medical assistant from 2002 to 2007.  She had a history of migraine headaches.  She had fibromyalgia and anxiety disorder with depression.  She had PTSD, bipolar disorder, major depressive disorder, obsessive-compulsive disorder, hypertension, diabetes mellitus, and GERD.

She was not having seizures anymore and she was taking medication.  She was not diagnosed with a seizure.  She passed out one day.  The doctors thought she was doing too many activities that day and it was a migraine not a seizure.  She was presently taking medication for seizures and migraines.  She was also taking medication for psychological problems.  She testified that she was in severe pain and she was sore all the time.  She had pain when she walked.  She was so fatigued that she would have to stay in bed the whole next day.  She was always out of breath and tired.  She was depressed and nothing made her feel any better.  She was told she had fibromyalgia.  She did not sleep at all.  She took sleeping medication that helped her sleep for a while.  She woke up 3-4 times per night.  She had to get up and walk around the house and then she might have slept another 20 or 30 minutes.  She was told her anti-depressant medication might have caused her sleep difficulty.  She had a nerve test on her legs that was negative.  She had a drop foot that still needed further follow up.  She sometimes cried a lot and became very emotional.  She did not visit her friends anymore.  She lived with her family.  She did not do housework anymore.  She tried to get her adult children to help.  She was not allowed to babysit her grandchildren.  When she had been working, her memory was not that good and she was forgetting stuff.  She had to stop working.  Her headaches had gotten worse.  She had migraines twice a week and it took two days to recover.  Her medications did not make the recovery faster.  They did take the edge off.  She had numerous migraine medications.  If she had advance notice of a headache she took her medications right away.  During the day, she would take a 30-minute nap.  Her pain in the morning was an 8/10 on a pain scale.  During the day, it got better and then would get worse again in the evening.  She tried to get laundry done and housework done but then she was in bed the whole next day.

(AR 16.)

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but her statements regarding the intensity, persistence, and limiting effects were not consistent with the medical evidence and other evidence in the record.  (AR 16.)  First, the ALJ found that, although Plaintiff described daily activities that were fairly limited, two factors weighed against considering this to be strong evidence in favor of finding Plaintiff disabled.  (AR 16-17.)  Her daily activities could not be objectively verified with any reasonable degree of certainty and, even if her daily activities were as limited as described, it was difficult to attribute the limitation to her medical condition as opposed to other

1   reasons in view of the weak medical evidence and other factors discussed in the opinion.  (AR

2   17.)  The ALJ found that the reported daily activities were outweighed by the other factors that

3   were discussed in the opinion.  (AR 17.)

4          The ALJ found that Plaintiff's allegations that she was unable to sustain the physical

5   demands of competitive employment were inconsistent with the medical record because the

6   objective clinical findings did not support the alleged limitations.  (AR 17.)  Plaintiff had been

7   seen by Dr. Raskin for her migraine headaches since May 17, 2010 to February 27, 2014.  (AR

8   17.)  She saw him on January 25, 2013, and reported that the medication she had been prescribed

9   had worked initially and then she became used to it so she was using excessive amounts of

10  hydrocodone.  (AR 17.)  Dr. Raskin changed her medication.  (AR 17.)  On February 27, 2014,

11  Plaintiff reported that she had improved significantly on the new medication.  (AR 17.)  Dr.

12  Raskin noted that Plaintiff's functioning had improved but was somewhat limited and she was

13  planning a big journey with her husband.  (AR 17.)  Plaintiff did not return to Dr. Raskin.  (AR

14  17.)

15         Although Plaintiff had been diagnosed with fibromyalgia, there was no evidence of

16  significant functional limitation beyond those limitations caused by her other impairments.  (AR

17  18.)  The overall objective medical evidence did not support a finding that she was unable to

18  perform any sustained work activity.  (AR 18.)  The ALJ found,

19         In fact, the objective medical evidence was wholly consistent with an ability to
           sustain medium work activity with the above-cited limitations.  The objective
20         medical evidence did not warrant any additional non-exertional limitations
           beyond those established in the residual functional capacity contained herein.  The
21         objective medical evidence failed to support the alleged severity of symptoms and
           degree of limitation alleged by the claimant.
22

23  (AR 18.)  Further, the ALJ found that Plaintiff's allegations that she was unable to sustain the

24  mental demands of competitive employment were inconsistent with the medical record because

25  the objective clinical findings do not support her allegations.  (AR 18.)  There were few objective

26  findings to support the limitations that Plaintiff alleged.  (AR 18.)  The ALJ found, "Ultimately,

27  the objective medical evidence of both physical and mental impairments failed to support the

28  alleged severity of symptoms and degree of limitation.  (AR 19.)  The ALJ considered Plaintiff's

presentation and reports to her treating physicians and the course of her medical treatment finding them inconsistent with Plaintiff's allegations.  (AR 19.)  Her use of medications did not suggest the presence of an impairment more limiting than found in this decision.  (AR 19-20.)

As discussed above, the record supports that ALJ's finding that Plaintiff only received intermittent and minimal mental heath treatment which is inconsistent with her allegations that she was unable to work due to her depression and her inability to remember things.  Evidence of conservative treatment is sufficient to discount a claimant's testimony regarding the severity of the impairment.  Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007).

Further, as the ALJ noted, Plaintiff refused additional treatment which was recommended by Dr. Jaques.  (AR 18, 874, 876, 878, 943, 945.)  The ALJ may properly rely on "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment."  Molina, 674 F.3d at 1113.  The ALJ could reasonable infer that Plaintiff's symptoms were not as severe as she alleged due to her refusal to accept Dr. Jaques treatment recommendations for her mental health symptoms, especially since he advised her that he would not prescribe alprazolam and would titrating down on her clonazepam.  (AR 874, 876, 878, 943, 945.)

Notably, although Plaintiff complained of severe pain due to her fibromyalgia, the medical record, although reporting a diagnosis of fibromyalgia, is generally devoid of any such complaints of pain and typically Plaintiff only reported symptoms from her migraines and occasionally acne or shortness of breath.  (AR 843, 845, 891, 889, 893, 897, 895, 901, 903, 908, 911, 917, 922, 958.)  Further, on November 29, 2016, Plaintiff reported that she was doing okay on her current medication regimen although she was barely managing her migraines with the current regimen.  (AR 889.)  She reported feeling fatigued all the time which is stated to be expected with the medications that Plaintiff is taking.  (AR 889.)  She did not report further issues with her migraines until March 24,2017 when she had a migraine flare-up.  (AR 952.)  There are no indications that she was having any additional problems at her April 18, 2017 follow up.  (AR 950.)   On June 6, 2017, it is noted that Plaintiff missed her last two appointments and was out of medication.  (AR 947.)  "Contradiction with the medical record is a

1   sufficient basis for rejecting the claimant's subjective testimony."  Carmickle v. Comm'r, Soc.

2   Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008).

3        Finally, the ALJ found that Plaintiff's complaints were not supported by the objective

4   medical evidence in the record which show generally normal examinations.  The determination

5   that a claimant's complaints are inconsistent with clinical evaluations can satisfy the requirement

6   of stating a clear and convincing reason for discrediting the claimant's testimony.  Regennitter v.

7   Commissioner of Social Sec. Admin., 166 F.3d 1294, 1297 (9th Cir. 1999).

8        The ALJ provided clear and convincing reasons that are supported by substantial

9   evidence in the record to reject Plaintiff's symptom testimony.

10       **D.    Third Party Testimony**

11       "In determining whether a claimant is disabled, an ALJ must consider lay witness

12  testimony concerning a claimant's ability to work."  Stout, 454 F.3d at 1053; 20 C.F.R. §

13  404.1513(b)(4).  "Lay witness testimony is competent evidence and cannot be disregarded

14  without comment."  Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009) (quoting Nguyen v.

15  Chater, 100 F.3d 1462, 1467 (9th Cir. 1996)).  The ALJ must give specific reasons germane to

16  the witness in discounting the lay witness testimony.  Stout, 454 F.3d at 1056.  If the ALJ gives

17  reasons for rejecting the claimant's testimony that are equally relevant to similar testimony

18  provided by lay witnesses, that would support a finding that the lay witness testimony is

19  similarly not credible.  Molina, 674 F.3d at 1114.

20       Here, the ALJ considered the third party function report provided by Plaintiff's daughter,

21  Savanna Vigil.  (AR 20, 313-321.)  The ALJ gave little weight to her testimony finding that it

22  was inconsistent with the objective medical evidence and the medical opinions in the record.

23  (AR 20.)

24       Ms. Vigil completed a third party function report on February 10, 2015.  (AR 313-321.)

25  She spent most of her day with Plaintiff and they talked, watched television or Plaintiff sleeps.

26  (AR 313.)  Plaintiff is always in pain from her migraines.  (AR 313.)  She is constantly sleeping

27  and hardly ever up.  (AR 313.)  Plaintiff is always sick and has to sit in the dark, light is too

28  much for her.  (AR 313.)  She gets tired fast and cannot move around or go anywhere.  (AR 313.)

Her hands, feet, and eyes get swollen easily.  (AR 313.)

Plaintiff wakes up about 7:00 in the morning and takes her medication.  (AR 314.)  She has a cup of coffee and then falls asleep until 4 or 5 p.m. at which time she gets up and fixes a meal.  (AR 314.)  Plaintiff will then take a nap until 9:00 p.m.  (AR 314.)  She will watch television and falls asleep while eating.  (AR 314.)

Plaintiff is hardly ever awake and cries in her sleep and when in pain.  (AR 314.)  If she does not get her sleep her body is in pain.  (AR 314.)  Plaintiff is always in her pajamas and is sometimes too tired to shower.  (AR 314.)  She does not have enough energy to fix her hair so she wears it in a bun or ponytail.  (AR 314.)  Plaintiff does not feed herself very often.  (AR 314.)  She has no difficulties using the rest room.  (AR 314.)  Plaintiff needs reminders to eat and to take her medication.  (AR 315.)

Plaintiff will prepare cereal, fruit, salads, sandwiches or a frozen burrito.  (AR 315.)  She prepares her own meals every other day otherwise her daughter or her mother prepare meals.  (AR 315.)  Plaintiff will spend an hour preparing meals.  (AR 315.)  Plaintiff will sometimes do the laundry, but does not finish what she starts.  (AR 315.)  It will take her all day because she forgets or falls asleep.  (AR 315.)  She has to be reminded and encouraged to do things.  (AR 315.)

Plaintiff just leaves the house to attend doctor appointments.  (AR 316.)  She is able to ride in a car, but cannot go out alone due to anxiety, dizziness, and fatigue.  (AR 316.)  She does not have a driver's license because it is unsafe due to her medical issues.  (AR 316.)  Plaintiff needs help with shopping.  (AR 316.)  She goes shopping once a month and it takes her two hours to get around the store if she goes alone.  (AR 316.)  Plaintiff can count change but is unable to pay bills, handle a savings account or use a checkbook or money orders.  (AR 316.)  She cannot pay bills on time because it is too much for her and she will forget to pay on time.  (AR 316.)

Plaintiff's hobby is watching television and she will fall asleep while watching.  (AR 317.)  She will not watch television when she has a migraine due to the light and noise causing pain.  (AR 317.)

1      Plaintiff watches television with other people every day.  (AR 317.)  She does not go

2 anywhere other than her doctor's appointments.  (AR 317.)  She goes to her scheduled doctor's

3 appointments but does not always make it to them.  (AR 317.)  Plaintiff does not attend any

4 family events.  (AR 371.)

5      Plaintiff's conditions affect her lifting, squatting, bending, standing, reaching, walking,

6 sitting, kneeling, talking, hearing, stair climbing, seeing, memory, completing tasks,

7 concentration, understanding, following instructions,  and using her hands.  (AR 318.)  Plaintiff's

8 ability to get along with others is not affected.  (AR 318.)  Plaintiff can walk from room to room

9 before needing to rest.  (AR 318.)  Plaintiff does not finish what she starts and does not follow

10 written instructions well.  (AR 318.)  Plaintiff cannot follow spoken instructions.  (AR 318.)

11 Plaintiff gets along fine with authority figures.  (AR 319.)  She lost her job because her employer

12 was very rude and talked to her in a bad manner.  (AR 319.)  She does not handle stress very

13 well.  (AR 319.)   She is not used to having a routine.  (AR 319.)   Plaintiff is sometimes

14 depressed.  (AR 319.)  Plaintiff has a lot of pain and sometimes the medications do not help her.

15 (AR 320.)  Plaintiff gets depressed because she can not do the things that she used to be able to

16 do.  (AR 320.)

17      The ALJ's finding that Ms. Vigil's third party function report is inconsistent with the

18 evidence in the medical record is supported by substantial evidence in the record as discussed

19 throughout the opinion.  For example, Ms. Vigil reported on February 10, 2015 that Plaintiff did

20 not finish things, forgets things, and needs reminders (AR 318), but as the ALJ recognized, on

21 April 16, 2015, Dr. Portnoff conducted his psychological examination of Plaintiff and found that

22 Plaintiff had adequate concentration, persistence and pace (AR 644).  She was able to recall three

23 items immediately and after several minutes and could count backwards from 20.  (AR 645.)

24 Plaintiff argues that the ALJ may not reject lay witness testimony because is it not supported by

25 the record; however, an ALJ may reject lay witness testimony that conflicts with the medical

26 evidence.  Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001); Bayliss v. Barnhart, 427 F.3d

27 1211, 1218 (9th Cir. 2005).  Here, the ALJ found that Ms. Vigil's testimony conflicted with the

28 medical evidence not that it was unsupported by the medical evidence.  The ALJ provided a

germane reason to reject the testimony of Ms. Vigil.

Further, to the extent that Ms. Vigil testified regarding the frequency and severity of Plaintiff's migraine headaches and fibromyalgia symptoms, the ALJ provided specific and legitimate reasons to reject Plaintiff's similar testimony.  The reasons gave to reject Plaintiff's testimony are equally relevant to reject the similar testimony provided by Ms. Vigil.  Molina, 674 F.3d at 1114.

## V.

## CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ did not err in evaluating the opinions of Drs. Barnett, Dillon, or Portnoff or by failing to provide legally adequate reasons to reject the testimony of Plaintiff or her daughter.  Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED.  It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Jane Bejerano Garcia.  The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated:  __April 16, 2020__                                    _____

UNITED STATES MAGISTRATE JUDGE